Morgan v. SSA                    CV-95-408-JD  04/26/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Debra Morgan

    v.                                    Civil No. 95-408-JD

Shirley S. Chater, Comm'r
Social Security Administration


O R D E R


The plaintiff, Debra Morgan, brings this action pursuant to § 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the defendant, Commissioner of the Social Security Administration ("Commissioner" or "government"), denying her claim for benefits under the Act. Before the court are the plaintiff's motion to remand the government's decision (document no. 5) and the government's motion to affirm its decision (document no. 8).

Pursuant to Local Rule 9.1 and the court's procedural order of January 3, 1996, the parties have filed the following joint statement of material facts, which the court incorporates verbatim:

JOINT STATEMENT OF MATERIAL FACTS


I.   ADMINISTRATIVE PROCEEDINGS.

The plaintiff filed an application for a period of disability and for disability insurance benefits on February 5, 1990 (Tr. 73-75), alleging an inability to work since September 29,

1986 at age 34.  The application was denied initially (Tr. 86-87) and on reconsideration (Tr. 116-117) by the Social Security Administration.  An Administrative Law Judge ("ALJ"), before whom Plaintiff, her attorney, and a vocational expert appeared, considered the matter de novo, and on August 15, 1991 issued his decision finding that Plaintiff was not entitled to disability benefits (Tr. 9-23).  On May 18, 1992, the Appeals Council denied Plaintiff's request for review (Tr. 4-5).

Thereafter, the plaintiff requested review with the United States District Court which remanded the case on March 26, 1993 for additional consideration (Tr. 494-497).  On October 20, 1994, the ALJ, before whom Plaintiff, her attorney, the vocational expert, and a lay witness appeared, considered the matter and on March 31, 1995, issued his decision finding that the plaintiff was not disabled and not entitled to disability benefits (Tr. 322-345).  On June 20, 1995, the Appeals Council again denied Plaintiff's request for review (Tr. 307-309), thereby rendering the administrative decision of March 31, 1995 the final decision of the Commissioner of Social Security, subject to judicial review.

II.  STATEMENT OF THE FACTS.

Plaintiff filed an application for disability insurance benefits (Tr. 73-75), based on disability, on February 5, 1990, alleging an inability to work due to lumbar disc disease (Tr. 120).  Plaintiff earned a GED and studied additional vocational courses, and has past work experience as a factory production worker and a manager and a cook in a restaurant (Tr. 125). Plaintiff's last date of insured status for disability purposes was March 31, 1988 (Tr. 153).

Medical Evidence

The medical record indicates that the plaintiff reportedly injured her back at work on February 10, 1987 (Tr. 169).[1]  While carrying food supplies at her mother's restaurant, Plaintiff said she sneezed and experienced pain in her left back, buttock, leg

---

[1] Plaintiff claimed her back condition first bothered her on September 29, 1986 after a work injury for which she provided no contemporaneous medical records (Tr. 73, 120); she continued to work full time until the alleged date of onset on February 16, 1987 (Tr. 120).

and foot; she rested at home for six days and took Valium and Tylenol (Tr. 169).

Physicians at Frisbie Memorial Hospital found that she was uncomfortable and ordered lumbosacral x-rays to compare them to films taken in 1980.[2]  X-rays revealed minimum, mild narrowing of L5-S1 without degenerative changes and tender left paraspinous muscles (Tr. 169, 187); a lumbar CT scan showed a large HNP at L4-L5 and mild generalized disc bulging at L5-S1, and an abdominal sonogram revealed no abnormalities (Tr. 187-188).

On March 4, 1987, Dr. DiMambro excised disc fragments from Plaintiff's lumbar area at L4-L5, and at discharge, she was prescribed physical therapy and a lumbar brace for support (Tr. 190-192).  Plaintiff was fairly comfortable, ambulated without assistance, had a little numbness in the left foot, and "was up and about with fairly good motion in the back" (Tr. 165).

Plaintiff was followed as an outpatient by Dr. DiMambro in April and May 1987 when he noted she was doing fairly well at home and reported "discomfort" in her back and left leg.  The doctor noted Plaintiff was involved in a contention with the insurance carrier regarding a worker's compensation claim (Tr. 209).

On July 7, 1987, Dr. John Shearman evaluated Plaintiff at the request of the worker's compensation carrier (Tr. 223-227). After review of all available medical records, Dr. Shearman examined Plaintiff and found her alert and oriented x 3 and she walked on her heels and toes.  Dr. Shearman found no clinical evidence of wasting or atrophy, she had reduced sensation over the left great toe and left thigh; straight leg raising was difficult at about 80 degrees, deep tendon reflexes were equal and symmetrical throughout (Tr. 225).  Plaintiff stated that she

---

[2] Plaintiff later stated that during 1979, she had experienced a complicated child birth and another industrial accident which resulted in L5 disc surgery (Tr. 223).  She stated she had dramatic improvement from 1979 to 1984 until she was able to work "many hours a week" (Tr. 224).

took Tylox, Fiorinal and Colace[3] and said that she took whatever she could to control her pain (Tr. 225).

Dr. Shearman concluded that she was neurologically intact, she had no muscle or nerve damage, and that her back surgery was very successful, but that she experienced pain and constipation. Plaintiff had limited straight leg raising, decreased sensation and chronic pain syndrome (Tr. 226). Dr. Shearman determined that she could sit for a fairly long period of time without too much difficulty. Dr. Shearman thought additional surgery was unnecessary and he assessed Plaintiff with 5% partial disability, according to AMA Guidelines (Tr. 226). He advised she follow a chronic pain management program to get back to a functional level, and cautioned that her own perspective may force physicians to surgery or other investigation at her insistence (Tr. 227).

On July 21, 1987, Plaintiff underwent a second lumbar CT scan which indicated loss of disc interspaces at L4-5 and L5-S1 due to degenerative disc disease (Tr. 213). The same day, Ronald Kulich, Ph.D., a clinical psychologist, evaluated Plaintiff's complaints of chronic pain (Tr. 231-235). Plaintiff said she worked in a restaurant from 1984 to 1987 that had been recently sold; she had difficulty climbing stairs, walking for more than 30 minutes, and peeling potatoes. She noted a decrease in recreational activities such as horseback riding, swimming, bingo and yardwork. She drank two beers per day, but she indicated this was not for pain relief (Tr. 232).

Plaintiff appeared cooperative and agitated when discussing her medical status, as well as various insurance issues; she denied most physiological symptoms of anxiety (Tr. 232). She described herself as "quite cranky and snappy" (Tr. 232). She said her stress included issues associated with settlement of a prior injury in 1982, opening a restaurant with her mother and sister with limited assistance, the 1985 disability of her mother and problems associated with her children, aged 8 and 16 (Tr.

---

[3] Tylox is indicated for relief of moderate to severe pain, Fiorinal is prescribed for relief of tension headache, and Colace is a stool softener. Physician's Desk Reference, 514, 1366, 2052 (48th ed. 1994).

4

232).[4]  Dr. Kulich diagnosed chronic pain syndrome with associated disability and adjustment disorder with depression secondary to pain.  After examination, Dr. Kulich recommended a medical work-up, a rehabilitation program for a limited time, and stated, "[U]nless medically necessary, an effort should be made to avoid analgesics and muscle relaxants to help minimize a tendency in misuse." (Tr. 234).[5]

In August 1987, Dr. Miller conducted a neurological consultative examination during which Plaintiff recounted a lengthy medical history, adding that she smoked a pack of cigarettes a day for 20 years and rarely drank (Tr. 240-242).  Based on an MRI of July 21, 1987, Dr. Miller believed she had a disc fragment at L4-5 that appeared similar to her pre-operative CT scan (Tr. 213, 241).  Dr. Miller recommended lumbar myelography and thin section CT scanning to resolve a question whether any additional structural abnormality may require further surgery (Tr. 241-242).

A lumbar myelogram and CT scan was performed at Frisbie Hospital on September 14, 1987, and showed mild generalized disc bulge at L4-5 and L5-S1, some variance in the nerve root sheaths at L4-5, and no other abnormalities (Tr. 196-197, 199).  Upon review of these results, Dr. Miller stated:

> I must admit, I was expecting to see somewhat more definitive structural abnormality to account for the recurrent symptoms.  As a matter of fact, the improvement in the current studies as compared with her pre-operative studies is so dramatic that I wonder why she hadn't obtained a more enduring and satisfying result. (Tr. 243).

Dr. Miller suggested that Plaintiff had many psychosocial problems to work out and noted that she made only one visit to the pain center in response to Dr. Kulich's advice.  Dr. Miller stated her record clearly demonstrated that, generally, future lumbar operations would lead to poorer end results (Tr. 244).

---

[4] During her second hearing, Plaintiff stated she and her husband were separated and on the way to divorce (Tr. 363).

[5] Dr. Kulich recommended Plaintiff undergo a "highly structured, time-limited rehabilitation program with specific activities/return to work goals." (Tr. 236).

In 1988, Plaintiff returned for monthly office visits with Dr. DiMambro and reported discomfort in the back and legs; he noted marked limitation of motion (Tr. 215). Dr. DiMambro recommended she stay off her feet or else walk, rather than do a lot of sitting. On January 3, 1988, Plaintiff sprained her right foot when she reportedly slipped and fell at home; x-rays were negative and she was advised to apply ice for a few days (Tr. 200-201).[6]

In April 1988, physiatrist William Knight, D.O., evaluated Plaintiff for complaints of low back pain that radiated toward the right buttock. Dr. Knight conducted straight leg raising tests and determined her right lower extremity was normal and her left leg could move through 50 degrees; her sensory exam was unremarkable, her motor exam revealed 4+/5 to 5/5 motor strength in the proximal and distal muscles of both legs, and an antalgic gait when weight bearing on the right lower extremity (Tr. 245). Dr. Knight concluded pool kinesitherapy would improve her mobility, flexibility and reconditioning and advised she use a brace (Tr. 246).

A physiotherapist developed a therapeutic swimming program, a home walking program, with short periods of activity and rest several times a day, back school, instruction in passive-resistive exercises to improve muscle strength and authorized Plaintiff to buy walking shoes (Tr. 248-249). Plaintiff saw the physiotherapist for one session on April 21, 1988, and did not return thereafter.

In May 1988, Dr. DiMambro decided to take Plaintiff off therapy for two months; then, in July 1988, he felt she would benefit from therapy (Tr. 216-217). In October 1988, Dr. DiMambro noted her improvement and stated, "it's simply time and Mother Nature that are doing more", and hoped that physical therapy would hasten her healing process; he recommended no additional surgical intervention (Tr. 217).[7]

---

[6] This was Plaintiff's final medical treatment before her insured status expired for disability purposes on March 31, 1988 (Tr. 153).

[7] Plaintiff underwent another MRI in December 1988, which showed disc bulging at L4-5, and Dr. DiMambro believed further surgery was unnecessary (Tr. 219-220).

6

In July 1989, Dr. DiMambro prepared a "[t]o whom it may concern" letter and noted Plaintiff had a good results from her surgery in March 1987 for several months, and that all her left-sided pain had been alleviated (Tr. 221). He noted that Drs. Miller and Prostkoff determined that no further surgery was necessary, but he did not agree with these opinions (Tr. 221). He stated that she has had constant pain and discomfort in both legs. Dr. DiMambro believed that Plaintiff could not work due to her "constant discomfort" and reported Tylenol #3 helped her, although she did not take it all the time (Tr. 221-222).

In August 1989, Dr. DiMambro referred Plaintiff to Dr. Roy Hepner for an evaluation. Dr. Hepner's examination revealed Plaintiff had essentially unchanged results from previous observations; there was no clinical deformity, her gait was normal, she could flex her trunk only to reach her knees, extension was extremely limited, left bending was normal, right bending was limited, sensation was diminished in a non-anatomic distribution; there was pain in the right buttock and tenderness in the LS area; there was no atrophy, her muscle strength was normal, straight leg raising tests were negative; lumbar x-rays showed narrowing of L4-5 and L5-S1 and mild scoliosis at L3-4 (Tr. 250). Dr. Hepner concluded a myelogram, post-myelogram CT scan and discogram should be ordered prior to possible lumbar multi-level fusion (Tr. 251).

In a subsequent evaluation with Dr. Kulich at the pain center, Plaintiff stated she took "30 to 40 Tylenol with Codeine a month" and occasionally drank alcohol "in place of the Codeine" (Tr. 238). Plaintiff said she was "sad", and that her financial pressures "have changed"; testing suggested she continued to be moderately distressed/depressed (Tr. 238). Plaintiff had not followed up with the counseling that Dr. Kulich had recommended earlier. Dr. Kulich observed Plaintiff was alert, oriented x 3, and communicative and felt she was still looking for "an ultimate cure, a resolution to all of her pain"; he encouraged her to pursue narcotic reduction/detoxification (Tr. 239).

In September 1989, Dr. John Shearman conducted a complete evaluation of Plaintiff after he reviewed previous medical reports and x-rays she brought to the examination (Tr. 228-230). Dr. Shearman found some muscle spasm pain, but there was no "clinically apparent abnormality" (Tr. 228). Plaintiff stated that she smoked one pack of cigarettes a day and occasionally used alcohol and marijuana (Tr. 230); he believed that she really should get some chronic pain insight.

7

Her physical examination revealed that all peripheral joints and axial skeleton had full range of motion; all muscle groups were measured at 5/5 without wasting, atrophy or fasciculations; muscle tone and coordination were normal, sensory system was intact, her deep tendon reflexes were equal and symmetrical, except for the right ankle which was decreased compared to the left, straight leg raising was negative, Rhomberg was negative. Plaintiff's heel-toe walking was normal and her gait and coordination were normal (Tr. 230). Dr. Shearman assessed Plaintiff with a 5% residual impairment based on her disc condition and residuals (Tr. 230).

When Plaintiff returned to Dr. Hepner in October 1989, he reported that she had achieved benefit from her previous back surgery and her left leg weakness gradually improved with physical therapy. A review of her MRI showed marked decrease in disc space signal and he recommended a full workup (Tr. 252). He noted that she had problems sitting after a blunt injury[8] two months after her back surgery (Tr. 266).

In November 1989, Dr. Hepner conducted a lumbar myelogram, a lumbar CT scan and discogram.[9] Radiologists reported that the tests showed mild ventral bulging at L4-5, a bony defect consistent with right L5 hemilaminectomy, and narrowing disc space at L4-5 and L5-S1. There was no significant change compared to CT scan results from September 1987 (Tr. 267). Dr. Hepner diagnosed Plaintiff's condition as degenerative disc disease and told her to continue her walking program, use ice for flare ups and to stop smoking (Tr. 256, 261). He discussed surgery with her, but she wanted to pursue other options, so he then scheduled her for physical therapy (Tr. 256).

In December 1989, Plaintiff told the physical therapist that she did minimal household chores, and she did not wash floors or

---

[8] In May 1987, Plaintiff had reported severe back and right leg pain during a card game where "somebody was fooling around and punching her" (Tr. 210).

[9] Radiologists confirmed the myelogram and CT scan showed previously reported narrowing disc space at L4-5 and L5-S1 and no significant changes from a previous CT scan in September 1987 (Tr. 267).

vacuum; she reported taking Halcion[10] and Tylenol (Tr. 272-273). She attended 5 of 12 scheduled physical therapy sessions from December 1989 to January 1990 when she was discharged (Tr. 278).

In March 1990, Dr. Stephen Klein conducted a neurological evaluation of Plaintiff at the request of the worker's compensation carrier (Tr. 279-283). Plaintiff said that since March 1987, that she had pain in her right hip and difficulty controlling her bowels (Tr. 280-281). Dr. Klein found she had no spinal instability, there was no basis for any further surgery and that she did not suffer from a major depressive component, but that one might anticipate profound post-operative morbidity with an increase in her pain response (Tr. 282).

Dr. Klein assessed Plaintiff's residual functional capacity. and determined she retained the capacity to lift, carry or pull objects weighing up to 15 pounds (Tr. 283). During a 4 or 5 day work period, working at least 25 hours per week, Plaintiff could sit or stand continuously for an hour and a half for a total of 3 hours. Plaintiff could tolerate some stair climbing, could bend at the waist three or four times an hour, and had no limitations for use of the neck, upper torso or both upper extremities. Plaintiff could drive her car for 2, 30 minute intervals during her workday. Dr. Klein believed she would have no problem operating foot pedals, but she should avoid pneumatic equipment, equipment that caused vibrations and climbing ladders. Dr. Klein strongly urged that Plaintiff learn to live with her pain symptoms, and follow the services of a rehabilitation specialist to help her return to the work force (Tr. 283).

In 1990, Dr. Hepner offered Plaintiff a two-level lumbosacral fusion (Tr. 260). He referred Plaintiff to Dr. Sachs in April 1990 for another opinion concerning surgery (Tr. 260, 284-286). Dr. Sachs found Plaintiff's neurological exam showed her motor, sensory and deep tendon reflexes were intact, bilaterally and symmetrically in both lower extremities; x-rays showed only very minimal scoliosis. Dr. Sachs stated her previous myelo CT scan from November 1989 was "within normal limits with no major disc fragment and no neurological cut off." (Tr. 285-286). Dr. Sachs recommended a spinal stabilization, but considered it prudent for Plaintiff to wear a brace for a period of time before any additional surgery (Tr. 286).

---

[10] Halcion is indicated for short term treatment of insomnia. Physician's Desk Reference, 2422 (48th ed. 1994).

Plaintiff saw a psychiatrist for the first time since her injury on May 23, 1990, when she reported feeling frustrated and bitter with the compensation insurance carrier (Tr. 287). Dr. Colgan reported her energy and interest levels were low, and offered his opinion that Plaintiff's mental and emotional states could be best dealt with in an inpatient setting (Tr. 288). After a 30-minute interview, Dr. Colgan prescribed Plaintiff an antidepressant (50 mg. Sinequan, 2 at bedtime) for depression and pain for one week. On May 29, 1990, Plaintiff reported improved sleeping, she was less depressed and had an improved appetite; Dr. Colgan told her to return in two months (Tr. 289).

Two days after seeing Dr. Colgan, Plaintiff referred herself to Strafford Guidance Center to vent feelings of 'frustration, anxiety and depression' (Tr. 290). Plaintiff stated that her increased agitation was precipitated by denial of her insurance coverage in March 1990, but that she functioned adequately in 1989 and in 1990 (Tr. 290). She recounted a long history of reported family problems and said her anger was primarily focused on her mother (Tr. 291). A social worker wrote that Plaintiff had difficulty dealing with denial of benefits and surgery, she denied any long-term depression, suicidal or homicidal thoughts (but fantasized about her mother dying), and she had average intellect, her judgment was fair and she was slightly demanding (Tr. 293). She was advised to seek individual psychotherapy but determined ineligible for state certification for services; no medication was recommended (Tr. 293). Two weeks thereafter, a psychiatrist observed she had an adjustment disorder, and a depressed mood, but no major depression (Tr. 296).

In October 1991, Dr. Hepner noted no change in her symptoms, and she was taking Motrin and Tylenol, and she used an exercycle. He advised she take daily walks, continue to exercise regularly, gave her a prescription for Halcion, p.r.n., at her request, and told her to return in four months (Tr. 507-508).

In February 1992, Dr. Hepner continued advice for Plaintiff was to stay active (Tr. 510). In July 1992, he opined that she "would benefit from what she does for herself, rather than from any passive modalities." (Tr. 513). Through 1993 and 1994, Dr. Hepner's notes indicated Plaintiff reported localized pain to the midline of the back, and he encouraged her to stay active and return for evaluations every three months (Tr. 515-522).

10

## Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner] with or without remanding the cause for a rehearing."[11]  In reviewing a Social Security disability decision, the factual findings of the Commissioner "shall be conclusive if supported by `substantial evidence.'"  Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).[12]  The court "`must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'"  Id.

---

[11]Effective March 31, 1995, Congress transferred the social security functions performed by the Secretary of Health and Human Services to the Commissioner of Social Security.  Irish v. Commissioner, No. 95-315-B, slip op. at n.4 (citing the Social Security Independence and Program Improvement Act of 1994, Pub.L. No. 103-296).

[12]Substantial evidence is "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

(quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)); accord Richardson, 402 U.S. at 401. The record must be viewed as a whole to determine whether the decision is supported by substantial evidence. Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Rodriguez, 647 F.2d at 222. Moreover, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222); see also Burgos Lopez v. Secretary of Health and Human Servs., 747 F.2d 37, 40 (1st Cir. 1984). The ALJ must also consider the plaintiff's subjective complaints of pain if he has "a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." 42 U.S.C. 423(d)(5)(A); Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 21 (1st Cir. 1986); 20 C.F.R. 404.1529.

In her motion, the plaintiff raises several arguments to support her contention that the Commissioner's denial of benefits was incorrect. The defendant responds that its decision should be affirmed as the record contains substantial evidence to

12

support its denial of benefits.  The court addresses the arguments <u>seriatim</u>.

## I.   The Commissioner Did Not Error at Step Three

The plaintiff first challenges the denial of benefits on the ground that the ALJ erroneously concluded that she did not suffer from a severe impairment.  <u>See</u> Plaintiff's Memorandum at 3.  The plaintiff contends that her spinal disorder and her depression, as established in the administrative record, meet or are medically equal to a listed impairment.  <u>Id.</u> at 6 (citing 20 C.F.R. § 404.1523).  The plaintiff further asserts that the ALJ failed to give appropriate consideration to the opinions of her treating physicians.  <u>Id.</u> at 4 (quoting <u>Walker v. Secretary of Health & Human Servs.</u>, 980 F.2d 1066 (1992)).

At step three of the Commissioner's sequential analysis, the ALJ evaluates the claimant's condition under the criteria established at 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d) (1994).  The claimant bears the burden of proving that his impairment meets or equals the criteria of a listed impairment, <u>e.g.</u>, <u>Dudley v. Secretary of Health & Human Servs.</u>, 816 F.2d 792, 793 (1st Cir. 1987), and any failure to satisfy this burden concludes the evaluation process, <u>id.</u>; <u>see</u> 20 C.F.R. § 404.1520(d), 416.920(d).

13

With respect to the spinal injury, the plaintiff asserts that at all relevant times she met listing 1.05 (C), which provides:

> C.   Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months.  With both 1 and 2:
>
>> 1. Pain, muscle spasm, and significant limitation of motion in the spine; and
>>
>> 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 404, Subpt. P, App. 1.05 (1995).  The ALJ explicitly rejected this contention in his final decision:

> The record does not show an impairment or combination of impairments listed in Appendix 1 to Subpart P.  The severity of the claimant's back condition which was diagnosed as degenerative disc disease of the lumbar spine does not meet or equal the level of severity required to meet any of the Listings under Section 1.00 or any other Listing.  As indicated, up through March 31, 1988 and at the present the claimant has not exhibited any medical evidence of significant arthritis, motor loss, muscle weakness or sensory and reflex loss which would warrant a finding of listing level severity.  The claimant was examined by numerous treating and consultative physicians and upon physical examination the claimant exhibited no significant neurological deficits, no muscle spasm or significant motor loss with muscle weakness with sensory and reflex loss as is required by Listing 1.05.  Even Dr. Hepner noted atrophy and normal strength (Exhibit 24).  As was noted by Dr. Shearman in his consultative evaluation, the clollenaimant's surgeries have not resulted in any neurologic or muscle wasting or damage (Exhibit 19).

Tr. 333-34.

14

The court finds that the Commissioner's rulings concerning the plaintiff's spinal injury are supported by substantial evidence. First, in his decision the ALJ explicitly relied on the medical findings of two physicians, including the plaintiff's own treating physician. Second, the announced conclusions are consistent with the findings of other medical sources discussed elsewhere in the ALJ's decision. See, e.g., Tr. 331 (Dr. Klein's observation that the medical findings were not indicative of spinal instability). Third, although the plaintiff correctly observes that the record contains evidence which would support a contrary finding, the ALJ was entitled to reject key portions of such evidence, i.e., statements by Dr. DiMambro that the plaintiff "totally disabled as far as any work is concerned," Tr. 212, 222, because the evidence contained conclusory statements concerning disability which lacked a specific basis or, in the alternative, because the evidence was inconsistent with objective medical findings and the opinions of other evaluating physicians. See 20 C.F.R. § 404.1527(e) (disability determination rests with Secretary and is not controlled by "medical source's statement that you are disabled"); Follensbee v. Secretary of Health and Human Servs., No. 94-177-JD, slip op. at 171-78 (D.N.H. March 28, 1995) ("The fact that another reasonable mind could arrive at a contrary interpretation [of the evidence] is not grounds for

15

reversal as it is the ALJ's responsibility to resolve conflicts in the evidence") (citing Irlanda Ortiz, 955 F.2d at 769). Fourth, the ALJ enjoys wide discretion and considers a host of factors when evaluating a claimant's medical condition and is neither required to accept the conclusions of any particular physician nor give greater weight to conclusions advanced by a treating physician where the treating physician's opinion is contradicted by other evidence and where the opinions are not supported by objective medical findings. See 20 C.F.R. § 404.1527; see also Arroyo v. Secretary of Health and Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (applying less favorable standard) (quoting Tremblay v. Secretary of Health and Human Servs., 676 F.2d 11, 13 (1st Cir. 1982)); Keating v. Secretary of Health and Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988) (quoting Barrientos v. Secretary of Health and Human Servs., 820 F.2d 1, 2-3 (1st. Cir. 1987)).

With respect to her mental health, the plaintiff asserts that she suffered from a debilitating depression up through March 31, 1988, and that this depression constitutes a listed impairment or is medically equal to a listed impairment. See Plaintiff's Memorandum at 3-6. The criteria used to evaluate depression and like disorders provide:

Affective Disorders: Characterized by a disturbance of
mood, accompanied by a full or partial manic or

16

depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, or one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; . . . AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (1994).

Consistent with the regulations, the ALJ addressed the plaintiff's mental conditions in the final decision, concluding that the plaintiff

did experience periods of situational depression. However, these episodes . . . were in reaction to her

> alleged physical condition and exacerbated by episodes
> of family conflict including the break up of her
> marriage and changes in her financial status. The
> record clearly indicates that the claimant's condition
> deteriorated for only brief periods of time until 1990.
> Her mental condition has not been shown to be
> exacerbated by stresses common to the work environment.
> There is no medical evidence showing any limitations in
> her ability to interact with others or deal with
> routine stresses during the period of time up through
> March 31, 1988. Moreover, there is no reflection of a
> chronic problem involving concentration or any other
> factor which would negatively impact upon her ability
> to sustain the mental attributes of work-related
> activity. Consequently, it must be found that the
> claimant did not exhibit a mental impairment which
> would be considered severe within the meaning of the
> regulations.

Tr. 333.

The court finds that the Commissioner's rulings concerning the plaintiff's depression are supported by substantial evidence. First, in the ALJ's final decision the ultimate finding of non-eligibility was thoroughly explained in terms of many key affected disorder criteria established by regulation. The ALJ also appended to his decision a completed three page "psychiatric review form" used by the Commissioner to evaluate a claimant's condition in accordance with the § 12.04 criteria. Second, the ALJ's conclusion was supported by subsidiary factual findings announced elsewhere in the decision. For example, the ALJ found that the record is devoid of "any documentation concerning any

18

ongoing mental health impairment prior to March 31, 1988," and "reports attributable to the claimant contained in therapy sessions subsequent to March 31, 1988 show that she did not have an ongoing mental health problem prior to 1989 or 1990." Tr. 331; see also Tr. 333 ("It was not until 1990 that the claimant required any extensive mental health treatment . . . [and] she reported to her therapist that she had been stable until the Spring of 1990). The administrative record also contains treatment summaries and clinical notes from the Strafford Guidance Center which support the ALJ's finding that "[t]here is no indication in her treatment reports of a condition existing prior to March 31, 1988 which would suggest a significant impairment involving her mental health." Tr. 332. Third, the scant evidence that the supports the plaintiff's claim of a severe mental impairment is equivocal and, fairly read, does not seriously undermine the substantial evidence supporting the Commissioner's contrary finding. For example, although the July 1987 report of Dr. Kulich indicates various social disorders related to depression, this diagnosis is preceded by a disclaimer that the testing method employed "can only be considered valid in the context of ongoing behavioral observation, and they do not preclude the presence of an organic disease or disorder." Tr.

19

233. Moreover, Dr. Kulich did not include among his recommendations a mental health treatment plan. See Tr. 234. Even less convincing is Dr. DiMambro's November 1987, report that the plaintiff also suffers from "social problems" considering that the doctor's December 1987, report states that "I think she is solving some of her social problems." Tr. 215. In any event, given the court's conclusion that the ALJ's finding of ineligibility on the mental disorder claim is supported by substantial evidence, supra, the fact that the record may contain conflicting evidence or, could even support a contrary conclusion is irrelevant under the applicable standard of review, supra.

The plaintiff also argues that the ALJ failed to properly consider her claim that the back injury and depression collectively constitute a listed impairment or are medically equal to a listed impairment. See Plaintiff's Memorandum at 6. The Commissioner is required to consider "the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523 (1995); see Martin v. Shalala, No. 94-282-L, 1995 WL 515698 at *6-7 (D.N.H. June 29, 1995) (considering combined impact of back pain and mental impairment).

20

The argument fails. Contrary to the plaintiff's assertion, it is clear from the final decision that the ALJ considered and rejected the claim that the combined impact of her conditions was more severe than the sum of the two parts:

> Although the claimant was noted to exhibit an adjustment disorder with depression secondary to her alleged pain in July 1987 (Exhibit 20), her mental status even when considered in combination with her back problem did not significantly interfere with her ability to perform basic work activities for a continuous 12 month period as required by . . . the Social Security Act at any time up through March 31, 1988.

Tr. 333; see also Martin, 1995 WL 515698 at * 6 (ALJ under no obligation to proceed with a further combined impairment analysis given factual finding that "at no time prior to [the last day of insurance] did plaintiff have an impairment or combination of impairments which lasted 12 months or more from alleged onset which would have interfered with his ability to perform work activity"). In any event, the plaintiff has failed to identify any evidence to support her bald claims of a combined impairment and, as such, cannot as a matter of law satisfy her burden of establishing an impairment of disabling severity. See, e.g., Dudley, 816 F.2d at 793.

21

## II. The Residual Functional Capacity Finding Is Not in Error

The plaintiff next challenges the Commissioner's final decision on the ground that she does not possess the residual functional capacity ("RFC") to perform the exertional requirements of certain light work.[13]  See Plaintiff's Memorandum at 6.  The plaintiff argues, inter alia, that the record is devoid of medical evidence to support the ALJ's conclusions, that the ALJ ignored the well-supported and documented opinions of her treating physicians, and that the ALJ failed to provide good reasons for disregarding such evidence.  See id. at 6-8.

The plaintiff's arguments are unavailing.  First, the ALJ's conclusions concerning the plaintiff's RFC are framed by specific

_____

[13]The ALJ found that

Through at least March 31, 1988 the claimant had the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting or carrying more than 20 pounds occasionally and 10 pounds more frequently, the performance of postural activities, significant bending at the waist, significant kneeling, any overhead reaching and positions which would not allow her the opportunity to change positions after one hour of activity of sitting and standing and walking (20 C.F.R. 404.1545).

Tr. 340.  The ALJ further found that, with the exception of these limitations, the plaintiff could perform the full range of light work but could not perform her past relevant work.  Id.

22

subsidiary findings announced throughout the final decision.
See, e.g., Tr. 337. These findings, in turn, are consistent with
substantial evidence contained in the record, such at the
plaintiff's own testimony concerning her daily activities,
information supplied to medical providers by the plaintiff and
the reports of treating and consulting providers. See, e.g., Tr.
76-85 (May 17, 1990, residual physical functional capacity
assessment of Dr. Campbell based on review of four physicians,
one psychologist, and various hospital and insurance records);
Tr. 93-100 (December 21, 1990, residual physical functional
capacity assessment in which Dr. Rainie concurs with May, 1987,
assessment). Indeed, in announcing his conclusions, the ALJ
explicitly addressed and, in some instances, credited the reports
of Dr. DiMambro, one of the plaintiff's longtime treating
physicians. Significantly, the ALJ explained in detail why he
did not adopt certain medical opinions which favor the
plaintiff's claims for benefits:

> Despite assertions from the claimant's treating sources
> that she was disabled, they have not identified
> objective medical findings or symptomology which would
> reduce the claimant's condition to a level as to
> preclude all work-related activities. The claimant has
> not exhibited objective functional limitations to the
> degree alleged.
>
> *   *   *   *

23

The evidence does establish that the claimant has had a
back impairment which would result in functional
limitations.  However, her evaluating sources did not
identify objective findings up through March 31, 1988
to support the level of limitations alleged by the
claimant.

\*   \*   \*   \*

The undersigned notes that the claimant's treating
sources including Dr. DiMambro and Dr. Hepner came to
the conclusion that the claimant was disabled.
Nevertheless, the undersigned does not find that the
objective medical findings and other evidence in the
record support the physicians['] statements that the
claimant is disabled within the meaning of the Social
Security Act.  These statements express legal
conclusions rather than medical opinions and do not
provide any relevant information about the claimant's
residual functional capacity.  These legal conclusions
do not show what tasks the claimant can or cannot
perform.  A determination of total disability must be
supported by medically acceptable clinical or
diagnostic data.  While there is diagnostic data
supporting the existence of a severe impairment
resulting in functional limitations, the undersigned
does not find the existence of any medically acceptable
clinical or diagnostic data to support the existence of
any further functional limitations which would also
meet the durational requirement.

Tr. 335-36, 337-38.  The court finds that these and other

findings satisfy the Commissioner's obligation to "give good

reasons . . . for the weight we give your treating source's

opinion."  See 20 C.F.R. § 404.1527(d)(2)(i).  Moreover, the

regulations plainly permit the ALJ to discount treating source

opinions where not supported by accepted laboratory and clinical

24

findings and where inconsistent with substantial evidence in the case record, see id. § 404.1527(d)(2), and reserve for the ALJ the final determination of certain issues, including a claimant's RFC and entitlement to benefits, see id. §§ 404.1527(e)(1), (2), 404.1546.[14]

---

[14]The plaintiff also asserts that

> there is no medical evidence in this matter which states that there was a period of time after February 16, 1987, and through March 31, 1988, when the Plaintiff was able to perform any type of work for any period of time or that she would be able to perform a job requiring her to stand for long periods of time and able to endure the pain she was experiencing while working at a job.

Plaintiff's Memorandum at 7-8.

The argument is flawed for any of three unrelated reasons. First, the Commissioner is responsible for the final assessment of a claimant's RFC, 20 C.F.R. §§ 404.1527(e), 1546, and although the ineligibility determination must be based on substantial evidence the regulations do not require that an RFC finding mirror an explicit conclusory statement by a medical source. Second, to the extent the argument addresses the plaintiff's ability to perform her past relevant work, the claimant, not the Commissioner, bears the burden "to establish that she lacks the RFC to return to such work." Moody v. Secretary of Health & Human Servs., No. 92-657-B, slip op. at 13-14 (D.N.H. March 31, 1994) (citing Gray v. Heckler, 760 F.2d 369, 371, 372 (1st Cir. 1985); Curtis v. Sullivan, 808 F. Supp. 917, 922 (D.N.H. 1992)). Third, the argument is factually inaccurate given the court's finding, supra, that the record contains substantial evidence to support the Commissioner's findings with regard to the plaintiff's RFC.

25

III. Subjective Complaints of Pain

The plaintiff's third principal challenge to the
Commissioner's decision focuses on the ALJ's failure to place
weight on her subjective complaints of pain.[15]  The plaintiff
argues that her complaints, as communicated to numerous treating
sources and as described under oath during the administrative
hearing, are consistent with the objective medical evidence,
various medical opinions, and her limited ability to perform
daily activities.  See Plaintiff's Memorandum at 8-10.

The ALJ is required to consider the subjective complaints of
pain or other symptoms by a claimant who presents a "clinically
determinable medical impairment that can reasonably be expected
to produce the pain alleged."  42 U.S.C. 423(d)(5)(A); Avery, 797
F.2d at 21; 20 C.F.R. 404.1529.  "[C]omplaints of pain need not
be precisely corroborated by objective findings, but they must be
consistent with medical findings."  Dupuis v. Secretary of Health
and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi
v. Secretary of Health and Human Servs., 764 F.2d 44, 45 (1st

_____

[15]The ALJ concluded that the plaintiff's complaints of
disabling pain were not adequately supported by her testimony and
were contradicted by, inter alia, her reported activity level,
her failure to participate in recommended treatment, and the
objective medical evidence.  Tr. 340.

26

Cir. 1985) ("The Secretary is not required to take the claimant's assertions of pain at face value.") (quoting <u>Burgos Lopez v. Secretary of Health and Human Servs.</u>, 747 F.2d 37, 40 (1st Cir. 1984)). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. 20 C.F.R. 404.1529(d). A claimant's medical history and the objective medical evidence are considered reliable indicators from which the ALJ may draw reasonable conclusions regarding the intensity and persistence of the claimant's pain. <u>Avery</u>, 797 F.2d at 23; 20 C.F.R. 404.1529(c)(3). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. <u>Id.</u>

When a claimant complains that pain or other subjective symptoms are a significant factor limiting her ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must undertake further exploration of other information. <u>Avery</u>, 797 F.2d at 23. The ALJ must consider the claimants's prior work record; daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of any medication taken to

27

alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. 404.1529(c)(3); Avery, 797 F.2d at 23; SSR 88-13. Moreover, when assessing credibility the ALJ may draw an inference that the claimant would have sought additional treatment if the pain was as intense as alleged. See Irlanda Ortiz, 955 F.2d at 769. If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the claimant's capacity to work. 42 U.S.C. 423(d); 20 C.F.R. 404.1529(c)(4). Finally, the court gives deference to credibility determinations made by the ALJ, particularly where the determinations are supported by specific findings. Frustaglia, 829 F.2d at 195 (citing DaRosa v. Secretary of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1985)).

In this case, the ALJ announced extensive and specific findings of fact which support his conclusion that the plaintiff's subjective complaints were not sufficiently credible to establish her claimed disability. First, the ALJ noted that the plaintiff did not exhibit "classic pain behavior" in the eyes

of multiple examining physicians and that her alleged pain levels were inconsistent with the treatment history and were "significantly greater" than the objective medical findings would suggest. Tr. 335. Second, the plaintiff was observed by an evaluating physician as late as September, 1989, as "being in very good shape and obviously quite active as evidenced by her excellent muscle tone and strength." Id. Third, the ALJ concluded that the plaintiff's

> failure to follow through with any of the multiple conservative therapy programs offered to her despite her assertions that she wanted to be pain free and undergo surgical intervention contradicts her allegations regarding the severity of her condition.
>
> * * * *
>
> If the claimant's level of pain was as severe as she alleged, it follows that she would have attempted to pursue whatever treatment modalities were offered of a conservative nature.

Id. at 336. Fourth, the ALJ noted earlier in his final decision that the plaintiff engages to various degrees in daily living activities, including cooking, cleaning, driving, and a significant amount of knitting and crocheting. Id. at 332.

The ALJ considered the Avery factors and, in so doing, made credibility determinations based on specific findings supported by the record. The ALJ also had the opportunity to observe the

29

plaintiff's demeanor at two administrative hearings and was entitled to draw inferences based on those observations. Moreover, the fact that the record is not equivocal in all respects does not compromise the ALJ's credibility assessment because conflicts in the record are necessarily resolved by the Secretary and not on appeal to federal court. See Irlanda Ortiz, 955 F.2d at 769. Given the deferential standard of review, the court concludes that the specific findings along with the overall record in this case demonstrate that the ALJ's conclusion that the subjective complaints were not credible is supported by substantial evidence.

IV.  The Plaintiff's Medical Condition Since 1988

The plaintiff's final challenge to the Commissioner's decision focuses on her medical condition since March 31, 1988, the expiration of her insured status. See Plaintiff's Memorandum at 10-11. Specifically, the plaintiff recites at some length a variety of medical findings which indicate ongoing difficulties related to her spinal injury and depression. See id. However, the plaintiff, represented by counsel, has failed to advance any legal theory or authority to support the apparent contention that the post-1988 medical evidence is grounds for the reversal of the

30

Commissioner's ruling that, for purposes of the Social Security Act, she was not disabled up through March 31, 1988. The government has not directly addressed this evidence.

In light of its prior rulings, supra, the court rejects the plaintiff's argument to the extent she asserts that the post-1988 evidence establishes that the Commissioner's finding of ineligibility is not supported by substantial evidence. See Irlanda Ortiz, 955 F.2d at 769; see also 20 C.F.R. § 404.1527.[16] Likewise, the court rejects the argument to the extent the plaintiff submits that a disability arising after her last day of insured status, the "decisive end-of-eligibility date," Evangelista, 826 F.2d at 138, relates back and entitles her to benefits. See, e.g., Foyto v. Secretary of Health & Human Servs., No. 93-361-M, slip op. at 3 (D.N.H. March 21, 1994) (citing 42 U.S.C. § 423(d)(1, 2)) (claimant must prove that disability arose before expiration of period of insured status).

---

[16]Of course, evidence arising after the date a claimant's insured status has terminated is relevant to the extent it is probative of the claimant's condition prior to that date.

31

Conclusion

For the foregoing reasons, the court grants the defendant's motion to affirm the decision of the Commissioner (document no. 8) and denies the plaintiff's motion to reverse the decision (document no. 5).  This order resolves the underlying dispute between the parties and the clerk is ordered to close the case.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
Chief Judge

April 26, 1996

cc:  Vicki S. Roundy, Esquire
     David L. Broderick, Esquire

32